AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. ☰:19MJ –574 |
| PEAK PERFORMANCE MEDICAL, LLC 8595 Beechmont Avenue, Suite 200 Cincinnati, Ohio 45255 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 and 846 | Conspiracy to Distribute and Distribution of Controlled Substances |

The application is based on these facts:

See attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Fairbanks, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/16/19

City and state: Cincinnati, Ohio

_____
*Judge's signature*

Karen L. Litkovitz
*Printed name and title*
U.S. Magistrate Judge

**Attachment A**

The Subject Premises is located at 8595 Beechmont Avenue, Suite 200, Cincinnati, Ohio 45255 in a building marked "8595".

The building is a brown, brick, multi-story building with large windows above the front and back entrances. The street level (from Beechmont Avenue) of the building has a KeyBank located to the left and a J.D. Byrider located directly to the right. The Subject Premises is located on the second floor, which is accessed through a door at the front of the building marked "8595". The door to the Subject Premises has a sign reading "SUITE 200/PEAK PERFORMANCE MEDICAL/"Feel Your Best"/My On Call MD/ALWAYS ON CALL". The building sits at the corner of Beechmont Avenue and Nordyke Road in Cincinnati, Ohio.



Street View from Beechmont Avenue



Front entrance of building



Sign in Lobby



Door to Subject Premises



Rear entrance of building

**Attachment B**

**Items To Be Seized from the Premises**

The items to be seized are the following, which constitute evidence, fruits, and instrumentalities of violations of, among other statutes, Title 21 United States Code, Sections 841 (Distribution of Controlled Substances); 846 (Conspiracy to Distribute Controlled Substances), dated from January 2016 to the present:

1. Documents constituting, concerning, or relating to patient files and related clinic records; electronic patient files, scheduling documentation, prescription pads, patient sign in sheets, daily dispensing logs, daily logs, any forms signed by patients, patient testing orders and testing reports used or obtained in patient care, appointment notes, procedure notes, physicians' orders, communication notes, assessments, insurance pre-certifications, follow-up assessments, discharge assessments, other patient assessments, medication profiles, consent forms, office compliance reviews, clinical records reviews, clinical licenses and certifications, correspondences, patient progress notes, and patient visit logs/sign-in sheets for patients who received scheduled prescriptions obtained with DEA Registration FE6719465. If these records are stored in electronic form images of these records will be made as outlined in the affidavit. If the records are stored in hard copy copies of the files will be made and returned to **PEAK PERFORMANCE MEDICAL** within a reasonable amount of time not to exceed fifteen (15) days.

2. Any invoices, order forms, credit memos, or any other documents related to the purchase, return or dispensation of controlled substances.

3. Any and all Dangerous Drugs (prescription drugs), Drugs not approved by the U.S. Food and Drug Administration, Records and paperwork of Dangerous Drug

Page 1 of 7

invoices involving drugs not approved by the U.S. Food and Drug Administration, Records and inventory of drug stock (paper and electronic), Financial statements (paper and electronic), Transfers of funds (paper and electronic), Records of shipping and receiving (paper and electronic), Compounding drug records (paper and electronic), Mailing records (paper and electronic), Patient records (paper and electronic), Administration records, that were obtained using or are related to U.S. Drug Enforcement Administration registration number FE6719465.

4.  Any pre-signed and blank prescriptions and prescriptions pads.

5.  Personnel and payroll files and records, such as employee lists, documents

payroll records, work schedules, time sheets, appointment books, employees notes or summaries, and other records showing the services provided by and all payments made to or for nurses, nurse aids, physicians, physical therapists, and other persons providing health services.

6.  Corporate and business records, articles of incorporation, resolutions, records regarding officers' duties and responsibilities, licensing records, property records, ownership, corporate structure, control and ownership.

7.  U.S. currency, tax records, bills, billing records, cash receipt books, booking ledgers, investment or retirement account statements, safe deposit boxes, or other items evidencing the acquisition, secreting, transfer, storage, concealment, and/or expenditure of money, assets, wealth, or other items of value which are used, or intended to be used, as the proceeds of, or to facilitate the illegal distribution of controlled substances.

8.  Bank and brokerage account monthly statements, opening records, checks, wire transfers, check registers, cancelled checks, deposit tickets, and records of transfer.

9.  Invoices, purchase orders, credit card information, wire transfers, payments, account statements, investment records and postal mailing records.

10. Calendars, appointment books, telephone message pads, day planners, logs,

books.

11. Foreign and/or domestic government issued passports and business records.

12. Any and all telephone records, personal diaries, written correspondence or emails

to, from, or between the owners or employees. Any correspondence, including

transmissions by, text message, facsimile and stored e-mail, exchanged between or involving any of the clinic employees, agents, or representatives located in the office.

13. Any information described in the proceeding paragraphs stored in electronic or magnetic media, electronic data processing and storage devices, computers and computer systems, including central processing units, internal and peripheral diskettes, tape drives and tapes, optical storage devices such as CD/DVD/Blu-Ray, including the video/audio recordings recorded on the office's recently installed video/audio system, together with system documentation, operating logs and documentation, software and instruction manuals. Any and all records showing or bearing indicia of the use, ownership, possession or control of the computer equipment, accessories, telephone(s), and modem(s). Any and all tapes, cassettes, hardware, computer disks, data disks, magnetic media, floppy disks, CD ROM disks, mobile devices, smart phones, tape systems, optical data storage media, hard disks, thumb drives, network attached storage, cellular telephones, and other computer relationship operational equipment.

   a. Your Affiant knows that computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of the crime. In the present case, your Affiant requests permission to search and seize

records, including that which may be stored on a computer. Your Affiant also requests permission to seize the computer hardware that may contain such records if it becomes necessary for reasons of practicality to remove the hardware and conduct a search off-site. Computer hardware is a container for evidence, was itself an instrumentality of the crime under investigation, and may be a container for contraband.

b. Based upon my training and experience and information related to your Affiant by agents and others involved in the forensic examination of computers, your Affiant knows that computer data can be stored on a variety of mobile devices, smart phones, systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes, thumb drives, memory chips, external hard drives, and cellular telephones. I also know that during the search of the premises, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

　　i. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

ii. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

iii. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.

iv. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. In additional, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data

that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

c. In light of these concerns, your Affiant hereby requests the Court's permission to seize the computer hardware, the digital video recorder (DVR) (and associated peripherals and mobile devices) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

d. The computer forensic examiner will attempt to create an electronic "image" of all computers that are likely to store the evidence described in the warrant. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain a forensic copy of the computer's stored data without actually seizing the computer hardware. The computer forensic examiner or another technical expert will then conduct an off-site search for the evidence described in the warrant from the image copy at a later date.

e. If "imaging" proves impractical, or even impossible for technical reasons, then the agents will seize those components of the computer system that the computer forensic examiner believes must be seized to permit the agents to locate the evidence described in the warrant at an off-site location. The components will be seized and taken into the custody of the agent. If, after

inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

f. Searching the computer system for the evidence described above will require a range of computer forensic analysis techniques. Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information. In order to properly execute the search authorized by the warrant, specially trained agents or forensic analysts will be required to conduct a thorough forensic analysis of the seized media, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your Affiant requests permission to use whatever computer forensic analysis techniques appear necessary to locate and retrieve the above-described evidence.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

IN THE MATTER OF:          :

                              :          Case No.:

THE SEARCH OF:          :

PEAK PERFORMANCE MEDICAL, LLC  :

8595 BEECHMONT AVENUE SUITE 200 :

CINCINNATI, OHIO 45255        :

                              :

## **AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

The undersigned, Michael Fairbanks, being first duly sworn, hereby deposes and states as follows:

### **Affiant's Background and Qualifications**

1.     This affidavit is made in support of an application for a warrant to search the business known as PEAK PERFORMANCE MEDICAL, LLC (PEAK) as more fully described in Attachment A. PEAK operates at, or has operated at 8595 Beechmont Avenue Suite 200, Cincinnati, Ohio 45255, as more fully described in Attachment A. The warrant seeks to seize computers, documents, patient files, and other evidence of criminal conduct of agents, employees and co-conspirators of PEAK, as more fully described in Attachment B.

2.     I, Michael Fairbanks, hereinafter referred to as the Affiant, am a Special Agent employed by the United States Department of Health and Human Services (HHS), Office of Inspector General (OIG), Office of Investigations (OI). I have been so employed since July 2010. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

3.      As part of my duties, I am authorized to conduct investigations, audits and inspections in connection with the administration and enforcement of laws, regulations, orders, contracts and programs in which HHS is, or may be, a party of interest, and perform other duties on behalf of the Secretary of HHS.  My chief responsibility is the investigation of fraud involving federally-funded health care programs.  As a Special Agent with HHS-OIG-OI, I have received basic criminal investigator training as well as specialized training in the investigation of fraud and financial crime.  Previously, I was employed as a Special Agent with the Ohio Attorney General's Office, Medicaid Fraud Control Unit.  Since June of 2005, I have investigated health care fraud against federally-funded health care programs commonly known as Medicare and Medicaid.

4.      The statements in this affidavit are based upon: my personal knowledge; information I have received from other law enforcement personnel; and information that I have received from persons with knowledge regarding relevant facts; information I learned during this investigation; oral and written reports about this and other investigations; physical surveillance conducted by investigators in which I have participated or that were reported to me directly or indirectly; public sources and business records; information reported to me by other federal, state, and local law enforcement officers during the course of their official duties; and my experience and background as a SA with HHS. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me or other law enforcement officers concerning this investigation.

## PURPOSE OF THE AFFIDAVIT

5.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known and described as the medical office of PEAK PERFORMANCE MEDICAL, LLC (PEAK), which is located at 8595 Beechmont Avenue Suite 200, Cincinnati, Ohio 45255 (the "**SUBJECT PREMISES**"), more particularly described in the following paragraphs and in Attachment A for evidence, instrumentalities, and fruits of violations of certain federal crimes, including violations of Title

21, United States Code, Section 841 (Distribution of Controlled Substances) and Title 21, United States Code, Section 846 (Conspiracy to Distribute Controlled Substances) (the "**SUBJECT OFFENSES**"), as further described in the following paragraphs and particularly in Attachment B, and to seize evidence of criminal conduct of **PEAK**, and other co-conspirators, known and unknown.

## BACKGROUND

### A. CONTROLLED SUBSTANCES ACT

6.     Title 21, United States Code, Section 812 establishes schedules for controlled substances that present a potential for abuse and the likelihood that abuse of the drug could lead to physical or psychological dependence on it. Such controlled substances are listed in Schedule I through Schedule V, depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence. Controlled Substance Pharmaceuticals are listed as controlled substances, from Schedule II through V, because they are also considered drugs for which there is a substantial potential for abuse and addiction.

7.     Title 21, United States Code, Section 841(a)(1) makes it an offense for any person to knowingly and intentionally distribute or dispense a controlled substance except as authorized by law. Distribution of a scheduled controlled substance in violation of 21 U.S.C. § 841(a)(1) (often referred to as "diversion") by a medical clinician occurs when a medical clinician knowingly and intentionally prescribes a controlled substance, knowing the drugs were controlled, for a purpose other than a legitimate medical purpose and outside of "the usual course of professional practice." *See United States v. Moore*, 423 U.S. 122, 124 (1975) ("We . . . hold that registered physicians can be prosecuted under 841 when their activities fall outside the usual course of professional practice.").

8.     Title 21, United States Code, Section 846 is violated when there is an agreement between two or more persons to commit a crime, here, unlawful distribution of a controlled substance; and

each defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

9.      Title 21, United States Code, Section 856(a)(2) makes it unlawful to "manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance."

10.     Title 21, Code of Federal Regulations, Section 1304.04 sets forth the requirements for maintaining records and inventory. It states in part: "every inventory and other records [i.e., prescriptions] required to be kept under this part must be kept by the registrant and be available, for at least 2 years from the date of such inventory or records, for inspection and copying by authorized employees of the [DEA]."

11.     The Controlled Substances Act ("CSA") governs the manufacture, distribution, and dispensing of controlled substances in the United States. *See 21* U.S.C. § 801 *et seq*. It is a federal offense for any person to knowingly or intentionally distribute or dispense a controlled substance except as authorization by law. *See* 21 U.S.C. § 841(a)(1) ("Section 841(a)(1)"). It is similarly a federal offense to conspire to violate Section 841(a)(1). *See* 21 U.S.C. § 846. The DEA was established in 1973 to serve as the primary federal agency responsible for the enforcement of the Controlled Substances Act.

12.     Legitimate transactions involving pharmaceutical controlled substances take place within a "closed system" of distribution established by Congress. Under the "closed system," Title 21 of the United States Code requires that all legitimate handlers of controlled substances (including manufacturers, distributors, physicians, pharmacies, and researchers) must be registered with the DEA and maintain strict accounting for all distribution.

13.     Legitimate distributions of controlled substances are limited by the scope of each type of registration. Title 21, United States Code, Section 802(21) defines a "Practitioner" to include physicians licensed, registered, or otherwise permitted by the United States or jurisdiction in which

he practices or does research to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research.

14.     Medical professionals, including physicians, must become registered with the Attorney General to be authorized under the CSA to write prescriptions for, or to otherwise distribute or dispense, controlled substances, as long as they comply with requirements under their registration. Title 21, United States Code, Section 822(b).  Such medical professionals are then assigned a registration number with the DEA.

15.     To comply with the terms of their registration, medical professionals cannot issue a prescription for a controlled substance unless it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. 1306.04(a).  Section 1306.04(a) provides that:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.  An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Controlled Substances Act (Title 21, United States Code, Section 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions relating to controlled substances.

16.     Put another way, a medical professional violates Section 841(a)(1) when he or she knowingly issues or fills a prescription for a controlled substance that is *not* for a legitimate medical purpose or outside the usual course of professional practice.

17.     Section 843(a)(2) states it shall be unlawful for any person knowingly or intentionally to use in the course of the manufacture, distribution, or dispensing of a controlled substance, or to use for the purpose of acquiring or obtaining a controlled substance, a registration number which is fictitious, revoked, suspended, expired, or issued to another person.

18.     DEA registrants can be prosecuted under 21 U.S.C. § 841 when their activities fall outside the usual course of professional practice. *See United States v. Moore*, 423 U.S. 122 (1975); *United States v. Darji*, 609 Fed. Appx. 320, 333 (6th Cir. 2015) (following *Moore*). A registrant's registration is limited to dispensing and use of drugs, "in the course of professional practice or research," and physicians who go beyond approved practice are subject to the criminal penalties of 21 U.S.C. § 841.

## B.     RELEVANT CONROLLED SUBSTANCES

19.     Testosterone is a Schedule III prescription drug. When used for legitimate medical purpose, Testosterone is used to treat such conditions as delayed puberty in males, hypogonadism, and metastatic breast cancer in females. Testosterone is available in several different forms including pellets that range in strength from 2.5 mg to 200 mg. Testosterone can be addictive and may be abused, typically at doses higher than recommended or in combination with other anabolic androgenic steroids. Testosterone abuse is associated with serious cardiovascular and psychiatric adverse reactions.

## C.     PRESCRIBING INFORMATION OBTAINED FROM OHIO AUTOMATED RX REPORTING SYSTEM (OARRS)

20.     The Ohio Automated Rx Reporting System ("OARRS") was established in 2006 and is a web-based system that collects information on all outpatient prescriptions for controlled substances that are dispensed by Ohio licensed pharmacies and prescribed or personally furnished by licensed prescribers in Ohio. The information in OARRS is available to prescribers (or their delegates) when they treat patients, pharmacists (or their delegates) when presented with

prescriptions from patients and law enforcement officers and health care regulatory boards during active investigations.

## BACKGROUND OF THIS INVESTIGATION

21.     An investigation into **CLINTON CORNELL** began in May of 2018. I have read reports created by other law enforcement officers, and reviewed other information gathered through the course of this investigation. This investigation specifically arose out of allegations that **CORNELL**, who is excluded from participating in the Medicare program as a result of his June 4, 2013 conviction for payment and receipt of health care kickbacks (42 U.S.C. § 1320a-7b(b) and b(2)) in the Western District of Michigan (Case Number 1:12-cr-17) was utilizing information of other clinicians to bill Medicare.

22.     According to documents filed with the Ohio Secretary of State **PEAK** is located at the **SUBJECT PREMISES**. The name of the registered agent is **DAVID ELLISON**.

23.     According to the Ohio Medical Board **ELLISON** is a Doctor of Medicine with licensure number 35.082208CTR. This licensure was issued on or about February 14, 2003 and expires January 1, 2021.

24.     According to the Ohio Medical Board **CORNELL** is a Physician Assistant with licensure number 50.003493RX. This licensure was issued on or about March 8, 2012 and expires January 31, 2020.

25.     **ELLISON** has multiple DEA licenses (FE6719465 and BE8246907) authorizing him to prescribe schedule 2, 2N, 3, 3N, 4, and 5 controlled substances. License FE6719465 was issued on or about May 1, 2017, includes the name **PEAK**, and has an address of the **SUBJECT PREMISES**.

## PROBABLE CAUSE OF VIOLATIONS OF LAW

26.     As set forth in this Affidavit, probable cause exists to believe that **CORNELL**, and others associated with his medical practice located at the **SUBJECT PREMISES** have committed the **SUBJECT OFFENSES**.

27.     Probable cause also exists to believe that evidence, fruits, and instrumentalities of the above-described violations will be found during the search of the **SUBJECT PREMISES**.

28.     Agents interviewed current and former **PEAK** associates beginning in or around August of 2018 and continuing through in or around July of 2019.  During these interviews, the following was provided:

    a.     **CORNELL** was interviewed on or about August 2, 2018.  **CORNELL** stated **PEAK** started in early to mid-2016 under the entity **COMMUNITY FIRST HEALTH SERVICES, INC (COMMUNITY)** and that he [**CORNELL**] was an owner of **COMMUNITY**.  According to **CORNELL, ELLISON** was the collaborating physician at **PEAK.**

    b.     **ELLISON** was interviewed on or about July 16, 2019.  **ELLISON** stated DEA Registration FE6719465 was fraudulently created using his [**ELLISON's**] identity. According to **ELLISON**, he was the third partner in a business group that included **PEAK** and until around September of 2018 supervised **CORNELL** at two locations, including the **SUBJECT PREMISES.**

        **ELLISON** stated his controlled substance prescribing habits were minimal and that he never had the need to order bulk shipments of controlled substances. **ELLISON** stated he was shocked to discover an account at **BELMAR SELECT OUTSOURCING (BELMAR)** set up using his information, DEA Registration FE6719465, the practice name **PEAK**, and the office address of the **SUBJECT PREMISES**.

29.      Agents interviewed current **PEAK** patient B.P. on or about May 30, 2019.  B.P. told agents he had visited **PEAK** at multiple locations including the **SUBJECT PREMISES** for approximately two years.  At **PEAK**, B.P. was always treated by **CORNELL** and never by **ELLISION**.  B.P. received weekly injections of Testosterone Cypionate 200 mg / 1 ml that were administered by **CORNELL**.

According to OARRS prescription data for DEA Registration FE6719465 B.P. received eight Testosterone prescriptions from **ELLISON** at the **SUBJECT PREMISES** between March 31, 2018 and April 11, 2019.

30.      Agents interviewed representatives and received documents from **BELMAR** in or around June and July of 2019.  **BELMAR's** Vice President of Quality (**BVPQ**) told Agents **BELMAR** initiated an investigation into **PEAK** after learning about fraudulent activity associated with the account tied to DEA Registration FE6719465.  **BVPQ** stated she and her staff received multiple inquiries from **ELLISON** on May 23, 2019.  **ELLISON** told **BVPQ** he had received a shipment of testosterone from **BELMAR** at his clinic that he had not ordered.  **ELLISON** claimed he had no knowledge of DEA Registration FE6719465.

**BELMAR** provided Agents **PEAK's** "New Account Application" form that was originally submitted to **BELMAR** on or about February 16, 2018 to activate the account.  The form for DEA Registration FE6719465 lists an office address of the **SUBJECT PREMISES**.

On  or about June 26, 2019 **BVPQ** told Agents **PEAK** orders totaled 827 pellets of testosterone over the course of twelve months.  As part of **BELMAR's** investigation, a phone call was made to **CORNELL**.  After discussing **BELMAR's** investigation **CORNELL** attempted to place another order of testosterone.  **CORNELL** said he would be willing to create another account. **BELMAR** informed **CORNELL** they would not be able to accept this request due to the nature of the fraud allegation.

31.     In August of 2019, a State of Ohio Compliance Specialist, who is qualified as a pharmacist, reviewed the results of an OARRS report from April 1, 2017 through August 2, 2019 containing DEA Registration FE6719465.

According to the Board of Pharmacy review, DEA Registration FE6719465 was used to prescribe 162 controlled substance dispensings to twenty-eight patients over the review period. Of those prescriptions, the Board of Pharmacy concluded that 72.2% were Medical Marijuana and 26.5% were testosterone. Prescriptions utilizing DEA Registration FE6719465 were issued from two different addresses. The first, the **SUBJECT PREMISES**, was responsible for 84% of the prescriptions, and the second, 2091 N. Bend Road, Suite 100, Hebron, Kentucky, was responsible for 16%.

The Board of Pharmacy review also identified that since April 11, 2018 DEA Registration FE6719465 was responsible for purchasing, at wholesale, a total of 73 separately invoiced controlled substances. All controlled substances purchased under this DEA registration were testosterone implants from **BELMAR**. Over the time period covered in the wholesale purchase report, the 73 unique invoices documented the sale of 784 testosterone implants.

## PROBABLE CAUSE TO BELIEVE THAT EVIDENCE OF CRIMES IS LOCATED AT SUBJECT PREMISES

32.     The **SUBJECT PREMISES** is further described and depicted in Attachment A, which is incorporated by reference into this Affidavit. This section of the Affidavit incorporates by reference the above-referenced paragraphs.

33.     To correctly identify the **SUBJECT PREMISES**, HHS-OIG and other law enforcement agencies have made searches of various databases and employed various methods of investigation, including the following:

          a.     searches of the Ohio Secretary of State database;

          b.     surveillance outside the **SUBJECT PREMISES** to observe individuals, vehicles, and activity; and

          c.     Public database checks of the **SUBJECT PREMISES**.

Page **10** of **13**

34.     **PEAK** uses the address for the **SUBJECT PREMISES** in its DEA Registration and the "New Account Application" with **BELMAR**.

35.     Based on my training and experience and knowledge of this investigation, I believe the patients **CORNELL** saw and prescribed controlled substances to at the **SUBJECT PREMISES** were outside the scope of professional practice, in violation of the **SUBJECT OFFENSES**. I believe, based on my training and experience that the majority of **PEAK/CORNELL's** patient files for these illegitimate prescriptions will be located at the **SUBJECT PREMISES** either in hard copy (paper) format and/or electronically on the computers located at the office, on laptops, or other electronic devices in the clinic.

36.     Based on my training and experience, I know the following:
   a.  Persons involved in drug trafficking, including medical professionals, often keep controlled substances, proceeds of drug sales, records of drug transactions and other records within their residences and businesses or within ready access, *i.e.*, in their storage areas, offices, homes, and vehicles, and conceal such items from law enforcement authorities. The drugs/prescriptions may be sold but documentary records and ledgers remain.
   b.  Persons involved in drug trafficking, including medical professionals, often purchase real estate, vehicles, or other expensive items using drug trafficking proceeds and maintain records, documents, or materials, evidencing such purchases in their offices, residences, or vehicles.
   c.  It is common knowledge within the law enforcement community that drug transaction records, books, account ledgers, payments, or notes and other evidence of financial transactions relating to obtaining, transferring, and spending substantial sums of money that result from engaging in drug trafficking activities are often maintained at or in the target's residences, businesses, safe deposit boxes, vehicles, and storage areas.
   d.  Persons involved in drug trafficking, including medical professionals, often retain personal and business notes, letters, and correspondence relating to their

Page **11** of 13

        prescription orders at or in their residences, businesses, vehicles, safe deposit boxes and storage areas.

e.   Clinicians routinely maintain patient files in their offices where they see patients. These records are considered "medical records" and are often stored in paper files at the location of the medical facility. Medical records often consist of, but are not limited to: patient treatment notes, medical laboratory testing, laboratory results, sign in sheets, claim forms, medication administration records, prescriptions, and other doctors' orders.

f.   Other than medical records, it is standard practice for documents to be kept by medical offices and pharmacies in the normal course of business reflecting daily billing, accounts received, bank records, deposit receipts, telephone records, appointment books, and sign in sheets. These financial records and billing documents often contain evidence to establish that patients have consulted with the clinician or have received prescriptions from the clinician. Further, prescription pads are normally kept in offices, exam rooms, and laboratories of medical practices that prescribe controlled substances. Pharmacies are required by Ohio state regulations to maintain original prescriptions for a period of no less than three years, and often maintain these prescriptions much longer.

g.   Computers are used in medical offices to record patient information, medical records, prescription logs, appointments, billing and payment records, work schedules, and other information needed to operate a medical practice.

37.    I expect that officers will find evidence of controlled substances distribution within the **SUBJECT PREMISES** in the form of controlled substances, United States currency, medical records (in any format including paper records and electronic records), sign-in sheets, charts, billing logs, payment records, prescriptions, patient files with fictitious documentation, dispensing logs, invoices, inventories, computers, computer servers and external hard drives, as described more particularly in ATTACHMENT B, hereby incorporated by reference.

## **CONCLUSION**

38.    Based upon the foregoing, probable cause exists to believe the **SUBJECT PREMISES** contains evidence of violations of the **SUBJECT OFFENSES.**


Further Affiant sayeth naught.


Michael Fairbanks
Special Agent
U.S. Department of Health and Human Services
Office of Inspector General, Office of Investigations


Sworn to and subscribed to before me this _16_ day of August 2019.


United States Magistrate Judge